**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Joseph Singfield MILLER, Sherri A. At-
kinson, Golden West Escrow Company,
Earl J. Harrington, Defendants-Appel-
lants.**

**Nos. 81–1287 and 81–1331 to 81–1333.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 9, 1982.

Decided May 3, 1982.

Rehearing and Rehearing En Banc
Denied June 21, 1982.

Joseph F. Walsh, Beverly Hills, Cal., argued, for Miller; Glenn S. Buzard, Encino, Cal., on brief.

Glenn S. Buzard, Encino, Cal., argued, for Atkinson, West and Harrington.

Richard R. Romero, Asst. U. S. Atty., Los Angeles, Cal., argued, for plaintiff-appellee; Stephen S. Trott, U. S. Atty., Robert L. Brosio, Asst. U. S. Atty., Los Angeles, Cal., on brief.

* Hon. Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

Before WRIGHT and SNEED, Circuit Judges, and SOLOMON,* Senior District Judge.

SOLOMON, Senior District Judge:

Appellants Joseph Miller, Sherri Atkinson, Earl Harrington, and Golden West Escrow Company (Golden West) were convicted of conspiracy to commit mail fraud, and to make or cause to be made false statements to federally insured savings and loan associations in violation of 18 U.S.C. §§ 371, 1341, and 1014. They were also convicted on fourteen substantive counts of making and causing the making of false statements to federally insured savings and loan associations, in violation of 18 U.S.C. § 1014, and of mail fraud, in violation of 18 U.S.C. § 1341. Miller was also convicted of seven additional counts of mail fraud and one other count of making false statements to a federally insured savings and loan association. Golden West was also convicted of another count of mail fraud.

On appeal, appellants assert that the district court improperly interpreted the mail fraud statute. They also assert that the evidence is insufficient to sustain their convictions and that the district court made erroneous evidentiary rulings.

The evidence showed that all appellants participated in a fraudulent scheme which purported to assist seven homeowners to avoid the foreclosure of their homes. According to the scheme, a homeowner who answered Miller's newspaper advertisements would be invited to meet in Miller's office, where Miller would explain his refinancing program. The homeowners would then deed their homes to Miller's company, the Central Finance Corporation (CFC), in order to prevent creditors from filing liens and judgments against the homes. The deeds were recorded by the County Record-

er's Office, and copies were mailed to CFC. Those mailings are the basis for seven of the mail fraud counts.

Miller would then find third parties to act as "straw purchasers" of the homes. The straw purchasers completed loan applications and other documents which stated that they would be the new owners and occupants of the homes. None of the straw purchasers actually intended to occupy any of the homes. They submitted the documents to federally insured savings and loan associations for the ostensible purpose of purchasing the homes from CFC.

The escrows were handled by appellants Harrington and Atkinson, employees of Golden West. When a lending institution sent Golden West proceeds of the loan, the escrow was closed, and the new loan became the new mortgage on the property. The proceeds from each new mortgage paid the balance of the existing mortgage which was in default; any remaining proceeds became Miller's fee. At the close of the escrow, CFC would deed the property to the straw purchaser, who would then deed it back to the homeowner. The homeowner would then be required to make the payments on the new mortgage, which payments would be higher than those of the old mortgage. In five of the seven transactions, the County Recorder mailed a copy of the recorded deed to the straw purchaser at the address of the house.

The evidence showed that the straw purchasers did not provide the down payments for the sales. Atkinson and Harrington lent the straw purchasers the down payment money; these loans were immediately repaid to Atkinson and Harrington, together with interest and high fees. Repayment checks were exchanged through Cal Coast Financial Corporation, a former employer of Harrington's, to hide the fact that Gold-en West was making the loans to the straw purchasers. In five of the seven transactions, Atkinson prepared Golden West receipts which falsely indicated that she had received the down payments from the straw purchasers.

Each loan application falsely stated that the straw purchasers had not borrowed the down payments. Five of the applications falsely stated that the down payments came from savings and earnings.

In one transaction, the savings and loan association required employment verification for the straw purchaser's wife. Miller falsely provided this verification.

These transactions greatly increased the homeowners' monthly mortgage payments. Most of the homeowners' equity was liquidated for Miller's financial gain, and foreclosures were merely postponed because the homeowners could not meet the increased monthly charges.

## I. MAIL FRAUD COUNTS

All of the mail fraud counts are based on copies of recorded deeds mailed by the Los Angeles County Recorder's Office.[1] These mailings are divided into two groups: (1) copies of deeds from homeowners to CFC, and (2) copies of deeds mailed to straw purchasers after the loans were approved and the escrow closed.

The appellants contend that the mail fraud statute does not apply to either set of mailings because the mailings were merely incidental to the scheme. Appellants assert that unless the mailing is to assist in the execution of the scheme, the statute does not apply. They cite *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), and *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944) but in each of those cases, the fraud was complet-

---

1. The mail fraud statute, 18 U.S.C. § 1341, provides in part:

    "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempt-ing to do so, places in any post office or authorized depository for mail, any matter or thing whatever to be sent or delivered by the Postal Service ... or knowingly causes to be delivered by mail ... any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

ed before each mailing, the mailings did not further the fraudulent scheme, and the use of the mail was not essential to the consummation of the scheme.

In *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–363, 98 L.Ed. 435 (1953), the Court stated:

> It is not necessary that the scheme contemplate the use of the mails as an essential element . . . Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he "causes" the mails to be used. *United States v. Kenofskey*, 243 U.S. 440 [37 S.Ct. 438, 61 L.Ed. 836].

Miller knew that the mails would be used in the ordinary course of business. The mailings were an integral part of the scheme. Miller acknowledged that each property was transferred to CFC to prevent creditors from filing liens and judgments against the property, acts which would have prevented him from refinancing. Miller also acknowledged that he wanted and needed the mailed copies to establish ownership and his ability to transfer title. He also wanted the recorded deeds for precise descriptions of the property.

■ A fraudulent scheme may depend on a mailing even after the defrauders have received their money. *United States v. Galloway*, 664 F.2d 161, 163 n.3 (7th Cir. 1981). Even after Miller took his "fee", his scheme required the straw purchaser to deed that property back to the homeowner. Only then was the transaction complete.

We hold that the mailings here satisfy the requirements of the mail fraud statute.

## II. MAIL DELIVERY OF ESCROW INSTRUCTIONS

■ Golden West is the only party charged in Count 10, a mail fraud count based on the delivery of a letter with certified escrow instructions. Golden West contends that the evidence was insufficient to show that the letter was mailed instead of hand-delivered. A Golden West employee testified that all documents that were hand-delivered were marked "delivered", but admitted that there were some exceptions. The document here was not marked "delivered". This evidence was sufficient to enable the jury to find that the letter was mailed. *See United States v. Brackenridge*, 590 F.2d 810 (9th Cir.), *cert. denied*, 440 U.S. 985, 99 S.Ct. 1801, 60 L.Ed.2d 248 (1979).

## III. SUFFICIENCY OF EVIDENCE

Harrington, Atkinson, and Golden West all contend that there was insufficient evidence that they knew about Miller's scheme. They contend that they merely performed routine escrow services in the seven transactions.

■ In reviewing the sufficiency of evidence, the standard is whether a rational juror could conclude from the evidence that the defendants are guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■ The evidence showed that Harrington and Atkinson provided the down payment in the seven transactions, and that they received almost $6,000 of the escrow funds as interest and fees. They exchanged checks with Cal Coast Financial Corporation in order to conceal the receipt of this money. Harrington also lied when he told an FBI agent that he did not know what Cal Coast was. Atkinson filled out Golden West forms acknowledging receipt of down payments from the straw purchasers. Even though acting through a third party, she provided the down payment in at least one of those transactions.

Harrington and Atkinson were officers of Golden West; their knowledge and acts are imputed to Golden West. *United States v. Beusch*, 596 F.2d 871, 878 n.7 (9th Cir. 1979).

The evidence was sufficient to sustain the convictions of these three appellants.

## IV. FALSE STATEMENT COUNTS

The false statement counts are based on statements made in loan applications that

the straw purchasers completed.[2] There were three types of false statements: (1) statements that straw purchasers were the sources of down payment funds; (2) statements that straw purchasers intended to occupy the properties; and (3) Miller's verification, under a fictitious name, that he employed the wife of a straw purchaser.

Harrington, Atkinson and Golden West contend that the statements made about the sources of the down payment funds were literally true, and that they did not know whether the straw purchasers intended to occupy the homes.

In all seven transactions, the escrow instructions recited, "I (the straw purchaser) will hand you ...", followed by a dollar amount. Defendants contend that these statements, literally construed, did not mean that the straw purchaser was making the down payment. However, an industry expert testified that they are not so interpreted by savings and loan associations, and the associations would not have approved the loans if they knew the down payment was made with borrowed funds. There was ample evidence from which the jury could find that Harrington, Atkinson, and Golden West all knew the true sources of the money used as down payments for the straw purchasers. There was other evidence which indicated that Atkinson and Harrington both knew that the straw purchasers did not intend to occupy the homes.

Miller's contention that the evidence is insufficient to support his conviction for falsely verifying the employment of a straw purchaser's wife is frivolous. He testified that he was told by a bank employee that he could verify the wife's employment himself. Miller, using a false name, stated that he had employed and paid the straw purchaser's wife. There was ample evidence to sustain his conviction on this count.

## V. IMPEACHMENT WITH SUPPRESSED STATEMENTS

Before trial, Miller moved to suppress statements he made to FBI Agent Kenneth Freking, which incriminated Atkinson, Harrington, and Golden West. The district court held that the statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and excluded them from the government's case in chief.[3]

The government used some of these statements to impeach Miller on cross-examination. Miller's direct testimony described in detail how his refinancing program worked. On cross-examination, the government asked him whether Harrington and Atkinson knew the details of the scheme. When Miller denied that they did, the government impeached him with the statements he had made to Agent Freking.

Appellants contend that (1) the statements were involuntary, and therefore inadmissible for any purpose under *Mincey v. Arizona*, 437 U.S. 385, 401–2, 98 S.Ct. 2408, 2418, 57 L.Ed.2d 290 (1978), and (2) even if the statements were voluntary, they were improperly used to impeach Miller on issues not raised in his direct examination testimony.

In *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the defendant was interrogated in a hospital room several hours after he had been seriously wounded. He was helpless, confused, and in great pain at the time of questioning. Under such circumstances, the Court held that his statements could not be "the product of a rational intellect and a free will," and the Court suppressed the statements for all purposes.

---

2. 18 U.S.C. § 1014 provides in relevant part: "Whoever makes any false statements or report ... for the purpose of influencing in any way the action of ... any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ... upon any application ... or loan ... shall be fined not more than $5,000 or imprisoned not more than two years, or both."

3. Appellants argue that the district court excluded Miller's statements on the ground that they were involuntary. The record shows that the appellants stressed the *Miranda* violations in their motion to suppress, and that the statements were barred on that ground.

We have examined the evidence here, and in our view the district court correctly held that the evidence did not show that Miller's will was overborne, or that his statements were coerced. Freking's statements to Miller that he was facing a long prison sentence, and his statements that he was contemplating employing Miller in a new business if he exonerated himself, do not require a different result. *United States v. Boyce*, 594 F.2d 1246, 1250–1 (9th Cir. 1979). In *Boyce*, FBI agents held the defendant in custody and induced him to confess by telling him that a coconspirator was under arrest. The court held that his waiver of his right to remain silent was voluntary.

Statements suppressed because of a *Miranda* violation may be used to impeach a defendant who takes the stand to testify in his own behalf. *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). However, the government may not raise issues on cross-examination unrelated to the defendant's direct testimony for the sole purpose of introducing the excluded statements. *United States v. Whitson*, 587 F.2d 948 (9th Cir. 1978).

In *United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980), the evidence indicated that Havens supplied a T-shirt used to smuggle cocaine. Havens, on direct examination, denied any involvement in the smuggling. On cross-examination, the government was permitted to use the illegally seized T-shirt to demonstrate Havens' participation in the smuggling operation. The court held that impeachment was proper because the issues had been raised on direct examination.

The rule of *Havens* is applicable here. During Miller's direct testimony, he reviewed the details of each of the seven transactions, including the participation by Golden West. This testimony reasonably suggested the government's inquiry whether Atkinson and Harrington knew of Miller's scheme. Miller's answers were therefore subject to impeachment by the evidence obtained in violation of *Miranda*. *Id.* at 627–8, 100 S.Ct. at 1916–17.

## VI. HEARSAY ERROR

Roland Perkins was the only homeowner who did not testify at the trial. The district court permitted the straw purchaser of Perkins' home to testify that after the escrow was closed, Perkins said that he did not intend to make the monthly payments on the new loan because they were too high. Miller moved to strike this testimony as hearsay. The district court denied the motion, citing the co-conspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E).

The co-conspirator exception requires that the out-of-court statements be made in furtherance of the conspiracy. *United States v. Eubanks*, 591 F.2d 513, 519–20 (9th Cir. 1979). Here, the statements by Perkins were made after the conspiracy had ended. Even assuming that Perkins was a co-conspirator, his statements did not further the objectives of the conspiracy, and should have been excluded.

The amount of the increase in monthly mortgage payments was shown by other evidence, and the evidence of Miller's guilt was overwhelming. Perkins' statement was harmless beyond a reasonable doubt.

All the convictions of Miller, Atkinson, Harrington, and Golden West are AFFIRMED.