**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ronald Carl WALL, Jr., Defendant–Appellant.**

**No. 96–2533.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 21, 1997.

Decided Nov. 21, 1997.

Raymond E. Beckering, III (argued and briefed), Larry C. Willey, Willey & Chamberlain, Grand Rapids, Michigan, for Appellant.

Daniel Y. Mekaru (argued and briefed), Office of the U.S. Attorney for the Western District of Michigan, Grand Rapids, Michigan, for Appellee.

Before: MERRITT, MOORE, and BRIGHT,* Circuit Judges.

---

* The Honorable Myron H. Bright, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

## OPINION

MOORE, Circuit Judge.

Defendant-Appellant Ronald C. Wall, Jr. directly appeals his conviction for mail fraud in violation of 18 U.S.C. § 1341. Wall's conviction arose out of a scheme whereby he arranged for the theft of his motor-boat and then filed a claim for the theft with his insurance company. On appeal, Wall alleges that the district court committed the following three errors: failed to grant his motion for judgment of acquittal; denied his motion for a mistrial; and refused to give the jury a good-faith instruction. For the reasons that follow, we affirm.

## I. BACKGROUND

In August or September of 1994, Robert and Scott Wollney ventured to a football game at Western Michigan, their college alma mater. Joint Appendix (J.A.) at 155 (R. Wollney Test.); 193 (S. Wollney Test.). The pair stayed at the game until half-time, and then walked over to Waldo's, a bar near the stadium where they encountered the defendant Wall, one of Scott's college friends. Scott knew that Wall owned two boats, one of which was a 1989 Wellcraft 186. He mentioned that Robb was interested in acquiring a boat and would be interested in buying the Wellcraft from Wall. J.A. at 156. Wall stated that he could not get enough money selling the boat to pay off the outstanding balance and suggested that he would be better off if someone just stole the boat because he could collect more money from his insurance company than he owed on the boat. J.A. at 194 (S. Wollney Test.); 157 (R. Wollney Test.). Robb and Wall then briefly discussed how the process worked and what steps Robb would need to take in order to acquire a fake title and registration numbers. The Wollneys eventually departed with the understanding that Robb would contemplate Wall's proposal and call him in a few days. J.A. at 194–95; 158.

A few days later, when Robb called Wall for further details regarding his proposal, Wall reassured Robb that faking receipts and acquiring a title and registration number would not be difficult. J.A. at 158–59. Sub-sequently, on September 13, 1994, Robb created fake receipts indicating that he had purchased a salvaged hull of a boat and an engine. He took these receipts to the Secretary of State's office and obtained a title. Next, he telephoned Wall who gave Robb directions to his house. Because Wall shared his house with his father, Wall also gave Robb times when he thought his father would not be at home. Robb made an abortive attempt to steal the boat, but the father was home that day. Robb attempted to get another time from Wall when he thought his father would not be home, but Wall was unsure of his father's travel schedule. J.A. at 163–65.

Subsequently, Robb had just finished running an errand and decided to drive by Wall's house. No one was home when he arrived, so he decided to take the boat. The boat sat on a trailer, which Robb hooked-up to his truck. Robb had the correct ball and hitch size because Wall had provided him that information. Also, the keys to the boat were in its ignition where Wall had left them for Robb. After hooking the trailer to his truck, Robb drove the boat to his apartment complex. J.A. at 166–68.

On that same day, Wall's father returned home to find the boat and trailer missing. J.A. at 152 (Wall, Sr.Test.). He first called Wall at work and then called the police, who took a report on the theft. J.A. at 144 (Deputy Sheriff Mulligan Test.). The officer who took the report from Wall's father also spoke with Wall because he was the owner of the boat. J.A. at 146. Wall provided a physical description of the boat and its contents and stated that no one had permission to use or borrow the boat.

On October 6, 1994, Auto–Owners Insurance Company ("Auto Insurance") mailed Wall claims information. J.A. at 119; 122 (Ins. Co. Adjuster Hurlbut Test); 306–11 (Letter and Enclosures). At the time Wall filed his claim with his insurance company, he owed approximately $11,124.48 to the bank that had financed his purchase of the boat. J.A. at 356 (Installment Loan Statement). He received $13,500 from his insurance company. J.A. at 124–25 (Hurlbut Test.); 313 (Copy of Check).

In August 1995 Robb traded in the stolen boat for a new one. J.A. at 170 (R. Wollney Test.). Shortly thereafter, Robb encountered Wall at the Coast Guard Festival where people displayed their boats, and mentioned that he had traded in the stolen boat for a new one. J.A. at 172. Becoming nervous, Wall asked Robb if he had removed the registration numbers from the hull of the boat and from the engine. Robb assured him that he had removed the numbers from both locations; however, he had not removed the numbers from the engine.

Approximately one month later, Robb received a call from the dealership where he had traded in the boat. J.A. at 173. One of the dealer's employees, Ken Korolowsicz, had some questions regarding Robb's title and registration numbers. His suspicion had been aroused when the person to whom Korolowsicz had sold the boat could not obtain insurance for the boat because of the registration numbers. J.A. at 141 (Korolowsicz Test.). Since he could not obtain insurance, the buyer returned the boat. Upon its return, Korolowsicz recognized the boat as belonging to Wall because of its distinctive engine. He then called Wall who told him that the boat had been stolen the previous year. Korolowsicz informed Wall that he had found his boat and then called the police. J.A. at 142–43.

Eventually, Detective Sergeant Steve Harshberger of the Kalamazoo Sheriff's Department contacted Robb and requested that he come into his office for questioning regarding the boat. J.A. at 173 (R. Wollney Test.). At their meeting the next day, Robb told Harshberger the entire story. J.A. at 174. A few days later, according to Harshberger's instructions Robb called Wall while Harshberger tape-recorded the conversation. Since the tape recording was inaudible, Robb called Wall a second time. Rather than incriminate himself, Wall recommended strongly that Robb get an attorney. J.A. at 175–76. Wall gave Robb the names of two attorneys, but Robb never contacted either one. J.A. at 178. Robb eventually reached an agreement with the United States Attorney's Office that, if he testified truthfully against Wall, he could plead guilty to a misdemeanor in state court. J.A. at 186.

A federal grand jury returned a two-count indictment against Wall for mail fraud. J.A. at 7–10. Count I charged Wall with causing his insurance company to mail him documents in furtherance of his scheme to defraud the company. Count II charged him with mailing documents to the insurance company in furtherance of his scheme to defraud the company. The government dismissed Count II before trial. J.A. at 210–11. After the jury found him guilty on Count I, J.A. at 103 (Verdict Form), the district court sentenced Wall to four months' incarceration, three years' supervised release, a $10,000 fine, $13,500 in restitution, and a $50 special assessment. J.A. at 38–43 (Judgment in a Criminal Case). The district court then entered judgment, and Wall filed this timely appeal.

## II. JURISDICTION

The district court properly exercised jurisdiction pursuant to 18 U.S.C. § 3231, and this court has jurisdiction pursuant to 28 U.S.C. § 1291.

## III. ANALYSIS

### A. DENIAL of JUDGMENT of ACQUITTAL

 Wall argues that the district court erred in denying his motion for a judgment of acquittal because the government failed to introduce sufficient evidence of the use of the United States mail. We review de novo the district court's denial of a motion for judgment of acquittal. *United States v. Pierce,* 62 F.3d 818, 826 (6th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 965, 133 L.Ed.2d 886 (1996). We examine the ruling to determine whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

 To convict a defendant of mail fraud, the government must prove two things: (a) a scheme to defraud, and (b) a mailing for the purpose of executing the

scheme.[1] *See, e.g., United States v. Griffith,* 17 F.3d 865, 874 (6th Cir.) *cert. denied,* 513 U.S. 850, 115 S.Ct. 149, 130 L.Ed.2d 89 (1994). The government can meet its burden of proof with circumstantial evidence. *Id.* Wall argues that the government did not introduce sufficient evidence to show that Auto Insurance ever used the U.S. mail to deliver the claim forms to him. We disagree and hold that the government introduced sufficient circumstantial evidence of the use of the U.S. mail by Auto Insurance. Because the government met its burden, the district court properly denied Wall's motion for a judgment of acquittal.

Testimony regarding a company's routine use of the postal service is sufficient circumstantial evidence to prove use of the U.S. mail. *Id.* "Mailing can be proved by office custom without producing as a witness the person who personally placed the letter in a United States mailbox." *United States v. Joyce,* 499 F.2d 9, 17 (7th Cir.), *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974). Furthermore, "[B]usiness practice may be established by the testimony of anyone with personal knowledge of the business custom and practice; it is not necessary that someone actually employed in the mail room establish this fact." *United States v. Hannigan,* 27 F.3d 890, 894 (3d Cir.1994). The government introduced the testimony of Dennis Hurlbut, an Auto Insurance claims adjuster, who testified that Auto Insurance maintained a routine practice of sending claim forms to its insureds via the U.S. mail.

J.A. at 122.[2] He further testified that even if an insured obtains the forms in person, the company still sends the forms to the insured via mail. J.A. at 128.[3]

Wall argues that Hurlbut's testimony is insufficient to show use of the U.S. mail by Auto Insurance. He asserts that Hurlbut had no personal knowledge of the mailing of the specific letter at issue, he did not give a detailed description of the office mailing procedures, and he did not provide a foundation for his knowledge of office mailing procedures. Appellant's Br. at 27–31. In support of his argument, Wall relies on *Hannigan.* In *Hannigan,* the witness, a claims supervisor for an insurance company, testified in her direct testimony as to the company's policy of using the U.S. mail. 27 F.3d at 891–92. However, on cross-examination, she admitted that she had no personal knowledge that the routine practice of her company was to use the United States mail. *Id.* at 892. She only knew that envelopes went to the mail room. *Id.* at 894. Neither she nor anyone else established what the business practice was once the envelopes went to the mail room. *Id.* The Third Circuit in *Hannigan* concluded that the evidence was insufficient to support a conviction.

The holding in *Hannigan* applies to situations in which the witness either has no personal knowledge of the office procedure or the office procedure varies as to methods of delivery. Thus, if the witness has no personal knowledge of office custom or if office custom varies as to methods of deliv-

---

1. 18 U.S.C. § 1341 (1994) provides in pertinent part:

 Whoever, having devised or intending to devise any scheme or artifice to defraud, ... places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, ... or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail ... according to the direction thereon or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both.

2. Hurlbut testified:

 Q: How do you send out the letter [that contains the information insureds need in order to file a claim]?
 A: Regular mail.

Q: Regular U.S. mail?
A: Correct.

3. In response to a question from the prosecutor, Hurlbut testified that if Wall had come into the office to pick up the claim forms, the forms would still have been "mailed" to him. Hurlbut did not specifically say "U.S." mail at that point. However, he previously testified that it is Auto Insurance's policy to use the U.S. mail. Because prosecutors need not negate every other delivery means, *see Griffith,* 17 F.3d at 874, a reference to "mailed" is presumptively a reference to "U.S. mail" unless otherwise contradicted. This conclusion is consistent with the requirement that in evaluating the sufficiency of the evidence, we "must credit every inference that could have been drawn in the government's favor." *Id.*

ery, no rational jury could find beyond a reasonable doubt, based on that evidence alone, that the company used the United States mail in a specific instance. Because use of the mail by either the defendant or his victim is an element of the crime of mail fraud, if a jury cannot find use of the mail beyond a reasonable doubt, then the jury cannot convict the defendant of mail fraud. As the Fifth Circuit explained in *United States v. Moody*, 903 F.2d 321, 332 (5th Cir.1990):

> Where, for example, the usual business practice includes the frequent use of private couriers ... the inference that United States mails ... were employed in executing the fraud is cast into serious doubt. Absent other probative evidence to show that a mailing ... occurred, ... a jury cannot reasonably overcome the presumption of innocence.

For example, in *United States v. Brooks*, 748 F.2d 1199 (7th Cir.1984), the government tried to prove the defendant's use of the mail by showing that he mailed his claim forms to the insurance company. In order to meet its burden, the government introduced testimony from an insurance company employee who testified that all documents received by the company in the United States mail were date-stamped. However, the employee also admitted that all documents received, whether from the United States mail or from private mailing services, were date-stamped; date-stamping itself did not distinguish U.S. mail from mail delivered by a private service. Thus, the court held that the date-stamp testimony was insufficient evidence to prove beyond a reasonable doubt that the defendant used the United States mail to deliver his claim forms to the insurance company. *Id.* at 1203–04. *See also United States v. Joyce*, 499 F.2d at 13, 18.

In contrast to the preceding cases, in cases where the witness testifies that the company has a practice of using the United States mail, and there is no evidence to the contrary, that testimony is itself sufficient to establish that the company used the United States mail in a particular instance. *See, e.g., United States v. Metallo*, 908 F.2d 795, 798 (11th Cir.1990) (holding that testimony as to the company's routine practice to send business correspondence by United States mail was sufficient to support the jury's determination that the defendant used the mail in furtherance of his fraud), *cert. denied*, 503 U.S. 940, 112 S.Ct. 1483, 117 L.Ed.2d 625 (1992); *United States v. Bowman*, 783 F.2d 1192, 1197 (5th Cir.1986) ("circumstantial evidence concerning the bank's customary practices was more than adequate to support the jury's determination that the mailing in fact took place."); *United States v. Keplinger*, 776 F.2d 678, 691 (7th Cir.1985) ("The inference that the sender acted in accord with its ordinary practice is reasonable, and the absence of a recollection of departure from that practice strengthens the inference that the practice was followed."), *cert. denied*, 476 U.S. 1183, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986); *United States v. Green*, 745 F.2d 1205, 1208 (9th Cir.) ("The government presented testimony by a [company] employee that it was routine at [the company] for mail in the outgoing basket to be picked up and placed in the United States mail. The evidence was sufficient for the jury to determine that the mail was used."), *cert. denied*, 474 U.S. 925, 106 S.Ct. 259, 88 L.Ed.2d 266 (1985).

In this case, Hurlbut specifically testified to Auto Insurance's routine use of the United States mail. There was no testimony that Auto Insurance used any other method of delivery than the United States mail. In fact, Hurlbut testified that, even where an insured appears in person to obtain the forms, Auto Insurance still sends the forms to the insured via the mail. Thus, Hurlbut's testimony was sufficient to raise the inference that Auto Insurance followed office procedure by mailing the claim forms to Wall via the United States mail. Based on that inference, a rational jury could have found that the government met its burden of proof. Consequently, we affirm the district court's denial of Wall's motion for a judgment of acquittal.

## B. MOTION for a MISTRIAL

Wall contends that the Assistant United States Attorney ("AUSA") made improper remarks in his rebuttal argument

during closing statements. During the trial, the government introduced a tape-recorded conversation between Robb and Wall in which Wall recommended that Robb get a lawyer.[4] Wall, in fact, gave Robb the names of two lawyers. Appellee's Br. at 10. *See also* J.A. at 175 (R. Wollney Test.). Wall further stated that he had contacted one of the lawyers on Robb's behalf and that the lawyer was expecting a call from Robb. *Id.* During its initial closing argument, the government did not mention the tape-recorded conversation. J.A. at 231–244. However, Wall's attorney discussed the tape during his closing argument. J.A. at 244–256. Wall's attorney exhorted the jury to give the tape little weight and attacked the credibility of Robb. J.A. at 254–256. As a result, in his rebuttal, the AUSA focused exclusively on the tape.[5] In so doing, he mentioned several times that Wall recommended his own lawyers to Robb. J.A. at 259–260.

Wall asserts that the AUSA prejudiced him by referring to the lawyers that Wall recommended to Robb as "Wall's lawyers." That is, the AUSA raised the inference that these lawyers were retained by Wall, and then the AUSA argued that Wall wanted Robb to go to "his lawyers" because those lawyers would protect Wall's interests. According to Wall that inference and argument were so prejudicial to his case as to require a mistrial.

▮▮▮ We review for abuse of discretion the district court's denial of a motion for a mistrial. *United States v. Wiedyk*, 71 F.3d 602, 607 (6th Cir.1995). Wall based his mistrial motion on the improper comments of the AUSA. When it is alleged that a prosecu-

tor made inappropriate comments during closing argument, we first determine whether the comments were improper under *United States v. Bess*, 593 F.2d 749 (6th Cir.1979), then whether the improper comments were flagrant under *United States v. Leon*, 534 F.2d 667 (6th Cir.1976). *United States v. Brown*, 66 F.3d 124, 127 (6th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 954, 133 L.Ed.2d 877 (1996). "If the conduct is found not to be flagrant, we will reverse only when (1) the proof against the defendant was not overwhelming, (2) opposing counsel objected to the conduct, and (3) the district court failed to give a curative instruction." *Id.*

The AUSA's comments were not improper. The defendant's counsel invited a reply from the government by focusing on the tape in his closing argument.[6] *See, e.g., Angel v. Overberg*, 682 F.2d 605, 607–08 (6th Cir.1982) (en banc) ("The prosecutor is ordinarily entitled to wide latitude in rebuttal argument and may fairly respond to arguments made by defense counsel."). In fact, at trial, defendant's counsel did not object to the AUSA playing the tape in rebuttal.[7] Instead, he objected to the characterization of the lawyers as "Wall's lawyers" and as recommended because Wall expected the lawyers to protect his own interests. J.A. at 271; 274; 277–78 (Motion for a Mistrial). Wall's claim in this case is similar to the claim made by the defendant in *United States v. Sturman*, 951 F.2d 1466 (6th Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2964, 119 L.Ed.2d 586 (1992).

In *Sturman*, the defendant-appellant's attorney, in his closing, argued that the prosecution did not offer any evidence linking his

---

4. The transcript of the conversation does not appear in the Joint Appendix. It appears only in the government's brief at 8–11. However, Wall does not object to the government's transcription of the tape as found at pages 8–11 of the government's brief.

5. In his rebuttal, the AUSA played the tape, pausing it on several occasions and making arguments between each pause. The district court thought the AUSA's presentation was calculated and that the AUSA had purposely waited until rebuttal to comment on the tape. J.A. at 271. However, the district court also acknowledged that had Wall's attorney not commented on the tape in his closing, the court would not have

allowed the AUSA to comment on it in his rebuttal. J.A. at 269–270.

6. In his closing argument defendant's counsel said "Mr. Mekaru [the AUSA] did not mention the tape. But [he] has another chance to talk with you, and I don't.... And I anticipate that in rebuttal, when I cannot respond, perhaps, Mr. Mekaru is going to talk about the tape. And I want to talk about the tape." J.A. at 254.

7. During the government's rebuttal argument, defendant's counsel said, "I think he's entitled to replay the tape...." J.A. at 258.

client to financial activity connected with Swiss bank accounts. In rebuttal, the prosecutor referred to cashiers checks from Nevada banks which had been deposited in Switzerland. That reference raised the inference that those checks established that money from sales in Nevada, where the defendant managed his co-defendant's businesses, had been moved into foreign banks. The defendant asserted that since the prosecution failed to introduce any direct evidence connecting him with those foreign bank transactions, the prosecutor's remarks were prejudicial and improperly suggested an unsubstantiated inference. *Id.* at 1477. In ruling against the defendant, we examined the evidence and found that it did support the inference suggested by the prosecution's rebuttal argument. Similarly, in this case, the evidence supports the inference that Wall knew these attorneys and recommended them to Robb for his own benefit. For example, Robb testified on direct examination that Wall recommended that Robb "speak to some of his attorney friends." J.A. at 175. On cross examination he testified that Wall recommended that Robb speak to "[l]awyers. His friends." J.A. at 184. He further testified on cross examination that Wall wanted Robb to get counsel "[f]rom people [Wall] knew...." J.A. at 184. Moreover, on the tape, Wall tells Robb that he has contacted one of the lawyers on Robb's behalf, and the lawyer is expecting a call from Robb. Appellee's Br. at 10. He even goes so far as to arrange a time for Robb to call the lawyer and volunteers to confirm that time with the lawyer. *Id.* Wall further tells Robb that he has the "[u]tmost trust" in the lawyer with whom he has scheduled a time for Robb to call. *Id.* at 11. Like the evidence in *Sturman,* the evidence here supports the inference suggested by the AUSA in his rebuttal argument. Accordingly, his rebuttal argument was not improper. Because it was not improper under *Bess,* we need not analyze it for flagrancy under *Leon.* Thus, we affirm the district court's denial of Wall's motion for a mistrial.

## C. GOOD–FAITH INSTRUCTION

 Wall claims that the district court erred in refusing to give the jury his requested "good-faith" instruction. "We will reverse a conviction for failure to give a requested jury instruction only when: (1) the requested instruction is a correct statement of the law; (2) the requested instruction is not substantially covered by other delivered instructions; and (3) the failure to give the instruction impairs the defendant's theory of the case." *United States v. Chesney,* 86 F.3d 564, 573 (6th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2470, 138 L.Ed.2d 225 (1997). Wall's argument fails because the district court's refusal to give Wall's requested instruction did not improperly impair his theory of the case.

 A defendant is entitled to have the district court instruct the jury as to his theory of the case when there is support in the evidence and the law for the theory. *See, e.g., United States v. Shelton,* 30 F.3d 702, 705 (6th Cir.1994). Wall's theory of the case is that he acted in good faith when he requested the claim documents from Auto Insurance, because Robb had stolen his boat. Appellant's Br. at 38. Since mail fraud is a specific intent crime, *see United States v. Smith,* 39 F.3d 119, 121 (6th Cir.1994), good faith is a complete defense to that crime. *See United States v. Josleyn,* 99 F.3d 1182, 1194 (1st Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 959, 136 L.Ed.2d 845 (1997). However, Wall is entitled to a good-faith instruction only if the evidence supports such an instruction. *Shelton,* 30 F.3d at 705. The evidence introduced at trial did not support that instruction.

At trial, although Wall did not testify, through cross examination of witnesses his attorney attempted to show that Wall did not participate in the theft of his boat. According to Wall's theory, Robb stole his boat, and Wall made a legitimate claim of loss to Auto Insurance. However, these facts merely support a claim that Wall is innocent of the charges, not that he acted illegally but did so in good faith. *United States v. Williams,* 728 F.2d 1402 (11th Cir.1984), a case remarkably similar to the instant case, illustrates this distinction. In *Williams,* the government charged the defendant with mail fraud for arranging the theft of his front-end loader by a friend and filing a claim for the loss

with his insurance company. The district court refused the defendant's request to instruct the jury as to his good-faith defense. In affirming the district court, the Eleventh Circuit explained that

> In all the cases wherein a conviction was reversed due to the failure to give a good faith instruction, there was evidence presented which, if believed by the jury, would render the defendant innocent because he did not have the intent to defraud or to make false statements. However, in the instant case the only way the jury could acquit [the defendant] would be if they found that he did not ask [his friend] to steal the loader. As noted by the government, this is not a "good faith defense," but merely a plea of not guilty.

*Id.* at 1405. Similarly, in this case, the only way the jury could have acquitted Wall was if it found that he neither asked Robb to steal his boat nor participated in the theft. As in *Williams*, such a defense is not a good-faith defense, but rather a "plea of not guilty." Consequently, as did the *Williams* court with respect to the defendant in that case, we too hold that Wall was not entitled to a good-faith instruction.

## IV. CONCLUSION

For the foregoing reasons, the judgment of guilty entered against Wall by the district court is **AFFIRMED**.