NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0407n.06

Nos. 17-6297/6311/6312

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Aug 05, 2019 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| AARON BROOKE WARREN; JOYCE MINTON; | ) | COURT FOR THE EASTERN |
| JAMES MINTON, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendants-Appellants. | ) | |

BEFORE:    **COLE, Chief Judge; BATCHELDER, and DONALD, Circuit Judges.**

   **ALICE M. BATCHELDER, Circuit Judge.**  This case involves theft by three family–member–employees—Joyce Minton, James Minton, and their son Aaron Brooke Warren (collectively, "Defendants"[1])—from Clark Machine Tool and Die ("Clark Machine").  Clark Machine, a custom-machine manufacturer in Nicholasville, Kentucky, is owned by Ray and Sue Clark and is operated primarily by their children, Lori Walker and Danny Clark.  Between 2000 and 2016, Defendants stole $2,708,153 from Clark Machine and were convicted of mail fraud, money laundering, and bank fraud and sentenced to prison.  The Mintons appeal their sentences, claiming the district court erred in prohibiting the introduction of exculpatory evidence, interfering

---

[1] Mr. and Mrs. Minton and Warren were tried together before the district court.  However, Warren appealed separately from Mr. and Mrs. Minton.  Some, but not all, of the issues that Mr. and Mrs. Minton appealed are the same as the issues Warren appealed.  For the sake of clarity, when referring to all three individuals, we use the term "Defendants."  When referring to Mr. and Mrs. Minton, we use the term "Mintons."  When referring to Warren, we use his last name.

with the cross-examination of a key witness, and admitting a jail phone call into evidence without proper authentication. Warren appeals his sentence, arguing that the district court erred by giving him a two-point enhancement for obstruction of justice, abused its discretion by failing to instruct the jury regarding good faith, and erred by denying his motion for discovery and quashing his subpoenas. We hold that the district court erred with regard to Warren's obstruction-of-justice enhancement, and we **VACATE and REMAND** as to that count. We **AFFIRM** on all other counts.

## I.

Ray founded Clark Machine in 1968. The company grew steadily and at its peak employed fifty to sixty employees. Since 2007, the company has had approximately $3,400,000 per year in revenue. Mrs. Minton began working for Clark Machine in 1993. Her job was to be the bookkeeper and manage "the purchase orders that came in, the billing that went out, all the items that were purchased for the jobs . . . and anything . . . associated with the taking care of the office." Over time she became the person "with [basically] exclusive control of the bookkeeping, the banking, and the office management." Warren started at the company in 1989, when he was just out of high school, and by 2016 had worked his way up to shop foreman. Mr. Minton was not a full-time employee of the company, but he did occasional contract work for Clark Machine. The Clarks considered the Mintons close friends.

As the company grew, Ray and Sue removed themselves from the day-to-day operations of the company, placing responsibility for running the company in the hands of their children, Danny Clark and Lori Walker, and Defendants. Although Ray and Sue remained involved in big-picture decisions and reviewed quarterly financial results, they did not closely track the expenditures and revenues of the company, instead leaving that up to Mrs. Minton. Unbeknownst

to the Clarks, Defendants took advantage of the trust placed in them by engaging in a variety of fraudulent schemes. For example, Defendants would perform metalworking and manufacturing work for Clark Machine customers but kept the payments for themselves. They used the company credit card and checks for personal purchases ranging from race car parts and sports equipment to a dehumidifier and an air conditioner. Mrs. Minton wrote checks to petty cash and kept the cash for personal use. She issued extra paychecks to herself from Clark Machine's bank account and inflated her and Warren's bonuses, and she gave Mr. Minton regular paychecks for contracting work that Clark Machine never authorized. The Clarks did not discover the fraud until they tried to pay rent for their office and Mrs. Minton told them there wasn't enough money in the bank to cover the rent. Initially, Defendants tried to blame the shortfall on "dead weight" employees, even going so far as to provide the Clarks with a list of employees they thought should be fired as a cost-saving measure. Instead of firing anyone, the Clarks started digging into financial records and uncovered Defendants' fraud.

Prosecutors filed an eighty-eight-count indictment against Defendants. The case went to trial, and Mrs. Minton was convicted of forty-six counts of mail fraud, conspiracy to commit mail fraud, bank fraud, and money laundering. Mr. Minton was convicted of seven counts of mail fraud and conspiracy to commit mail fraud. Warren was convicted of thirty-four counts of mail fraud, conspiracy to commit mail fraud, and money laundering. Mrs. Minton was sentenced to ninety-seven months in prison, Mr. Minton to eighteen months in prison, and Warren to forty-six months in prison. Defendants appeal, alleging the district court erred in five separate ways. For the following reasons, we affirm the district court on all counts except for Warren's enhancement for obstruction of justice.

**II.**

**A.**

The Mintons claim first that the district court erred in admitting a jail phone call without proper authentication. We review a trial court's evidentiary rulings for abuse of discretion. *United States v. Hickey*, 917 F.2d 901, 904 (6th Cir. 1990). The Mintons stipulated to the authenticity of the call before the start of trial. Absent a request for relief from the stipulations—and such a request was never made here—stipulations are binding upon the parties. *Fed. Deposit Ins. Corp. v. St. Paul Fire & Marine Ins. Co.*, 942 F.2d 1032, 1038 (6th Cir. 1991). The district court did not abuse its discretion by adhering to the parties' stipulations.

The Mintons argue also that the call was unintelligible. The Mintons do not cite legal authority for or develop this argument in their initial brief. It is therefore forfeited. *See United States v. Sandridge*, 385 F.3d 1032, 1035 (6th Cir. 2004) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (quotation marks and citation omitted). Even if the Mintons had developed the argument, we still would affirm because, having listened to the audio recording, we conclude that "the unintelligible portions do not 'render the recording as a whole untrustworthy.'" *United States v. Adams*, 722 F.3d 788, 823 (6th Cir. 2013) (quoting *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir. 1983)). Although portions of the audio recording are difficult to understand, some phrases—such as Mrs. Minton's saying, "they know pretty much everything," "they know it all," and "they know all of it"—come through distinctly. Accordingly, we hold that in admitting the recording the district court did not abuse its discretion.

**B.**

The Mintons claim next that the district court abused its discretion when it interrupted the cross-examination of Billy Slone. "When a trial court limits the scope of cross-examination, this court reviews that determination for an abuse of discretion." *United States v. Kone*, 307 F.3d 430, 436 (6th Cir. 2002).

The Mintons argue that the cross-examination cut off by the district court went to the "crux" of their defense. Specifically, they say Mr. Minton's defense was "that he performed a great deal of work over the years and was able to keep track of his work and allowed to credit his 'account' and be paid when he wished, by Clark Machine funds, rather than funds of Ray Clark personally." According to the Mintons, the accounting of the "credit" that Mr. Minton built up over time "was made in a ledger book kept in Joyce Minton's desk, that was never produced at trial."

We reject the Mintons' arguments because the Mintons' lawyer's questions the judge cut off were irrelevant to any issue in the case. The lawyer appeared to be arguing that because Clark Machine paid Billy Slone for work he did on personal projects for the Clarks, Mr. Minton was also allowed to be paid by Clark Machine for personal projects he did for the Clarks. But the dispute between the Clarks and the Mintons was never about *who* paid the Mintons—i.e., the Clarks personally or Clark Machine—but rather about whether the Mintons were entitled to the payments they received, whatever the source. The testimony of Slone sheds no light on this dispute. Furthermore, as the district court said at trial, Clark Machine was a closely held corporation and its money belonged to the Clarks. Therefore, the Clarks could "pay anybody [with Clark Machine funds that] they want to pay . . . As long as they know they're paying for [Slone] to work on their house, they can pay it. It's fraud if they don't know that they're paying somebody for doing

something that is being done with their money." The Clarks were aware of the payments to Slone; they were not aware of the payments to Mr. Minton. Slone's testimony is irrelevant because the payments to Mr. Minton, unlike the payments to Slone, were fraudulent.

Furthermore, even if the questions had been relevant, the district court allowed the Mintons' lawyer to question Slone extensively. The trial transcript on this line of questioning runs over seven pages before the court intervenes. The district court is permitted to stop lines of questioning that are cumulative. Fed. R. Evid. 403; *see also United States v. Callahan*, 801 F.3d 606, 623 (6th Cir. 2015) ("[T]rial judges retain wide latitude to impose reasonable limits on interrogation that is repetitive or only marginally relevant.") (alteration in original) (quoting *United States v. Obiukwu*, 17 F.3d 816, 821 (6th Cir. 1994)). The district court did not abuse his discretion in telling the Mintons' lawyer to move on.

## C.

Defendants jointly claim that the district court erred in denying Warren's pretrial discovery motions and quashing his pretrial subpoenas.[2]

*Pretrial discovery motion.* "We review the District Court's order on a discovery motion in a criminal case for an abuse of discretion." *United States v. Kincaide*, 145 F.3d 771, 780 (6th Cir. 1998). In his discovery request, Warren asked for "two (2) electronic databases; copies of checks and deposits of Clark Machine; surveillance records; email records; and tax records from the company as well as its principals." Warren alleged that the "records are necessary to the defendants to rebut the accusations that the defendants unlawfully took money belonging to their employer, Clark Machine." Warren cited Federal Rule of Criminal Procedure 16 and *Brady v.*

---

[2] Although only Warren made the discovery motions and issued the pretrial subpoenas, the Mintons joined Warren in appealing the district court's quashing of the subpoenas. The Mintons did not appeal the denial of the discovery motions.

*Maryland*, 373 U.S. 83 (1963), for the proposition that he was entitled to these records. But neither Rule 16 nor *Brady* requires the government to turn over information that it does not possess, have custody of, or control. Fed. R. Crim. P. 16(a)(1)(E) ("[T]he government must permit the defendant to inspect and to copy or photograph . . . [certain specified items] if the item is within the government's possession, custody, or control."); *United States v. Tavera*, No. 11–6175, 2013 WL 3064599, at \*\*1 (6th Cir. June 20, 2013) ("[T]he Supreme Court held in *Brady* . . . that the government must provide defendants with material, exculpatory evidence in its possession.").

Warren has not even alleged that the government possessed, was in custody of, or controlled the records he seeks. Rather, in his motion for discovery, Warren simply contends that it is "unreasonable for the government to dismiss the defendant's requests by saying it cannot give what it does not have. Rule 16, this Court's discovery order, and *Brady* . . . require the government to do more than simply rely on what they are given." But the government went to great lengths to describe all of the information that it had provided Warren and to describe that which Warren sought but the government did not possess. "[T]he government does not have a duty to disclose items it does not possess. . . [n]or does it have a duty to obtain evidence it does not possess." *United States v. Sarras*, 575 F.3d 1191, 1215 (11th Cir. 2009). The district court did not abuse its discretion in denying the motion for discovery.

*Subpoenas*. Following the denial of his discovery motion, Warren issued nine subpoenas pursuant to Federal Rule of Criminal Procedure 17 seeking essentially the same information that he requested in the discovery motion. The government moved to quash the subpoenas, and after conducting a motion hearing, the court "indicated its agreement [with the government] with respect to the irrelevance, oppressiveness, and lack of specificity with respect to the evidence sought by the subpoenas." However, "in an abundance of caution" the district court "took the Motions to

Quash under advisement and provided Defendants with the opportunity to file *ex parte* statements detailing dates, places, checks and bank records that specifically relate to proof of permission given by the Clarks and/or Clark Machine to incur such expenditures." Warren then narrowed his request to three areas: specific emails, Clark Machine surveillance video, and credit card statements. The district court nevertheless granted the motion to quash the subpoenas due to "the lack of specificity of Defendants' requests, the burdensome nature of producing the information requested, and the irrelevance of the requested information to the defense in this case." "We review the district court's decision to quash a subpoena duces tecum under Fed. R. Crim. P. 17(c) for abuse of discretion." *United States v. Theunick*, 651 F.3d 578, 591 (6th Cir. 2011).

As an initial matter, "Rule 17(c) was not intended to provide an additional means of discovery. Its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials." *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951). In *United States v. Nixon*, the Court delineated the requirements that a moving party must meet for a Rule 17(c) subpoena to be properly issued:

> [I]n order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition." Against this background, [three hurdles must be met]: (1) relevancy; (2) admissibility; (3) specificity.

418 U.S. 683, 699–700 (1974) (footnote omitted). We agree with the district court that Defendants do not meet these requirements for any of the three categories of information they seek.

Starting with the request for specific emails, Defendants sought their recovery because they claimed the emails contained financial statements from Clark Machine.[3] Defendants contend further that these emails and financial statements are necessary to show that the Clarks were aware of the expenditures Defendants were making and not only gave Defendants permission to make them but specifically instructed Defendants to do so.

This request fails the first *Nixon* requirement. As the district court properly noted, "the fact that certain financial statements may have been forwarded to the Clarks for their review does not show that the Clarks gave Defendants permission to engage in the actions alleged in the Indictment." On appeal, Defendants still fail to explain with the necessary specificity why the information is relevant. Instead, Defendants broadly assert that "it is clear" the information is relevant because "[t]he documents and records clearly would have made the allegations made in the Indictment more or less probable." But merely repeating the exact words of Federal Rule of Evidence 401 does not suffice for an argument as to relevance. The request also fails the fourth *Nixon* requirement because this is exactly the broad type of request that indicates a "fishing expedition." *See Blue Cross, Blue Shield of Ohio v. Klein*, No. 96-3805, 1997 WL 400095, at \*3–\*4 (6th Cir. July 11, 1997) (remanding the case to the district court to determine if the government's extremely broad demand for information amounted to "fishing"). Despite the district court's admonition to limit their subpoena, Warren still demands "a copy of *all* of [a specific individual's] emails" to the Clarks, even while acknowledging these emails were sent "each month . . . for many years." This is hardly a narrow request and strikes us as a fishing expedition in the hope of finding exculpatory information.

---

[3] Defendants' Joint Motion for Discovery was filed under seal. *See* RE 51-1 at 239. In its discussion of the Motion, the district court treated the Motion as still under seal and discussed the emails in broad generalities only. *See* RE 52 at 255–56. Although we have reviewed the specifics of the Motion, because the district court never lifted the seal we too speak about the emails in generalities.

Defendants' request for surveillance video also fails the first *Nixon* requirement. Defendants originally requested that "*any* video still in existence be produced." In their revised request, Defendants do not state specifically what they are seeking, but it appears they want any *interior* surveillance video still in existence. Putting aside whether this request is meaningfully narrower than the last one—which is doubtful—it is still not clear how this will show that the defendants had permission to use Clark Machine money to purchase, for example, race car parts, athletic shoes, and a set of golf clubs. Defendants allege that the interior video recordings will show that Danny Clark opened packages delivered to the workplace, and that among these packages were "purchases and shipments to the defendants" related to the transactions in the indictment. Defendants also allege the interior video will show "Danny Clark working side-by-side with Mr. Warren on various projects that underlie many of the counts in the indictment." But opening packages or working side-by-side with a supervisor doesn't demonstrate that the supervisor gave permission to use the company credit card to fund personal hobbies. This is especially true given the Clarks' testimony that Mrs. Minton was the person who made all the materials purchases and managed all the accounts, and there is no evidence in the record that Danny Clark would have known that a certain package or project was for the benefit of Defendants rather than Clark Machine. Indeed, Danny Clark testified that he had never been in control of the books, had never examined the books, had never been involved in banking or payroll, nor had he otherwise involved himself in the accounting or managerial office functions. The district court did not abuse its discretion in quashing the surveillance video subpoena.

Moving to the credit card statements, Defendants fail to show why these are relevant, and the subpoena therefore fails the first *Nixon* requirement. Defendants claim they "need information to corroborate the fact that they acted with the Clarks['] authority and as instructed in making

10

purchases" and they say "this evidence is contained in the credit card statements showing the purchases of all six persons who had a Clark Machine credit card." But as the district court pointed out, "Defendants overlook that credit card statements show only the basic information regarding charges that are made, such as the date of the charge, the amount of the charge, and to whom the charge is made." Defendants offer no explanation as to why this information would help them establish that the Clarks knew about the fraudulent purchases. Instead, they rely on the vague assertion that "[h]aving the information showing how all the card holders used this credit card will show that the Clarks had knowledge of how Mr. Warren was using this card, and by their ten-year silence, the Clarks have expressed their authorization and permission to Mr. Warren." But Defendants acknowledge that they already have the credit card statements detailing Warrens' own expenditures; they offer no explanation as to why this information would not be sufficient to show that Warren purportedly had the Clark's permission to make those expenditures. Furthermore, as stated previously, the Clarks testified that the only financials they reviewed were the company's monthly and/or quarterly results. Defendants cannot explain why additional credit card statements would be helpful when the Clarks say they never looked at anything at that level of detail. The district court did not abuse its discretion in quashing the subpoena relating to the credit card statements.

## D.

Warren claims that the district court erred in denying his request for a good-faith jury instruction. We review for abuse of discretion a trial court's refusal to give a requested jury instruction. *United States v. Gunter*, 551 F.3d 472, 484 (6th Cir. 2009). "A trial court's refusal to give a requested jury instruction is reversible error only if the instruction is (1) correct, (2) not substantially covered by the actual jury charge, and (3) so important that failure to give it

substantially impairs defendant's defense." *United States v. Heath*, 525 F.3d 451, 456 (6th Cir. 2008) (quoting *United States v. Sassak*, 881 F.2d 276, 279 (6th Cir. 1989)).

Warren argues that he "believed, in good faith, that he was acting with the permission and knowledge of the Clarks." He therefore "requested that the District Court provide the good faith instruction contained in the Sixth Circuit Pattern Jury Instructions." These jury instructions would have informed the jury that "[a]n honest mistake in judgment or an honest error in management does not rise to the level of criminal conduct." *Sixth Circuit Pattern Jury Instructions, Criminal,* § 10.04(2) (2019). The government objected to the good-faith instruction, and the district court did not give the instruction on the grounds that there was no evidence to support it. We agree with the district court. *See United States v. Wall*, 130 F.3d 739, 746 (6th Cir. 1997) ("[A defendant] is entitled to a good-faith instruction only if the evidence supports such an instruction.").

The evidence does not support giving Warren's instruction because Warren is confused about the meaning of "good faith." Warren's theory of the case—and the evidence he presented to support his theory—was that the Clarks gave him permission to buy personal items with their money. A good faith defense is appropriate when the defendant acts illegally without knowing his actions are illegal. *Id*. When a defendant argues that he had *permission* to do something, as Warren did in this case, the defendant is not mounting a good faith defense; he is asserting "merely a plea of not guilty." *Id.* at 747 (quoting *United States v. Williams*, 728 F.2d 1402, 1405 (11th Cir. 1984)).

For instance, Warren testified that Danny Clark approved a transmission purchase for his dragster, that the Clarks sponsored his racing, that the Clarks approved his purchase of a dehumidifier for his home using the commissions he made at Clark Machine, and that his "commission agreement with Danny Clark was 1 percent of . . . gross sales." In making these statements, Warren was not saying he *believed* he had permission from the Clarks to make these

purchases, but that he *actually* had permission. Because a good-faith jury instruction is appropriate when there has been an "honest mistake in judgment or an honest error in management," *Sixth Circuit Pattern Jury Instructions, Criminal,* § 10.04(2) (2019), and because none of Warren's statements speak to a mistake or error, the district court did not abuse its discretion in refusing to give Warren's requested jury instruction.

## E.

Warren argues next that the district court erred in assessing a two-point Sentencing Guidelines enhancement for testifying falsely at trial. The United States Sentencing Guidelines provide that if the "defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to . . . the instant offense of conviction," then the defendant's offense level should be increased by two levels. U.S.S.G. § 3C1.1. "For a district court to enhance a defendant's sentence under § 3C1.1, the court must: 1) identify those particular portions of defendant's testimony that it considers to be perjurious; and 2) either make a specific finding for each element of perjury or, at least, make a finding that encompasses all of the factual predicates for a finding of perjury." *United States v. Lawrence*, 308 F.3d 623, 632 (6th Cir. 2002). The elements of perjury are set out in 18 U.S.C. § 1621. A defendant violates this statute if he or she, while "testifying under oath or affirmation . . . gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). A "district court's factual determination that [a] defendant testified falsely about material matters . . . is reviewed for clear error." *United States v. Camejo*, 333 F.3d 669, 675 (6th Cir. 2003).

The district court said that the "telltale" sign of perjury in Warren's testimony was his claim to have had the Clarks' permission to purchase a set of TaylorMade golf clubs in 2016, when in

reality the Clarks never gave him permission. The court said that Warren "got up and testified that those irons were a . . . gift" for getting the low score at a Clark-sponsored golf tournament. The court then said that "flyers for all three of the Clark Machine golf outings [in 2014, 2015, and 2016]" were admitted into evidence, and "in no instance was there ever a mention of a set of TaylorMade irons as a prize for the low score." The court called Warren's testimony "a pretty clear indication of the obstruction of justice."

But the court got the facts wrong. Warren never said that golf clubs were given as a prize in a 2016 golf tournament. Instead, he said that in 2016 the clubs "were never going to be a giveaway" at the golf tournament. Warren said that by 2016, "We had changed . . . the [prizes] . . . They were different. They wasn't the same gifts." The district court appears to have confused this testimony by Warren with the Mintons' attorney's opening statement, in which the attorney said that "Clark Machine put on a golf tournament every year, and they gave away a set of golf clubs as a prize every year. These golf clubs [currently owned by Warren] . . . were given away as part of a golf outing." It is true that Warren's testimony contradicts this part of the Mintons' attorney's opening statement, but that does not suffice to support a charge of perjury. Instead, the contradiction identified by the court shows "confusion, mistake, or faulty memory" on the part of the Mintons' attorney. *Dunnigan*, 507 U.S. at 94. Indeed, the government's attorney admitted as much at trial: "[I]t's been represented—I don't know if any witness ever did it, but an attorney said golf clubs were a prize for a golf tournament." This contradiction therefore does not suffice to show a "willful intent to provide false testimony." *Dunnigan*, 507 U.S. at 94.

Because the district court erroneously identified a contradiction in Warren's testimony, we decline to affirm its holding. In so doing, we express no opinion as to whether Warren's inconsistent testimony about the golf clubs involved perjury or whether he should receive a

§ 3C1.1 enhancement. Nevertheless, because the district court attributed statements to Warren that Warren did not make, and because the court used those misattributed statements in its determination that Warren obstructed justice, we vacate Warren's two-level obstruction of justice enhancement and remand for proceedings consistent with this opinion.

### III.

We **VACATE and REMAND** the district court's holding regarding Warren's two-point enhancement for obstruction of justice. We **AFFIRM** all of the district court's other holdings.