RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0175p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 25-5540

SAMUEL HARRIS,

*Defendant-Appellant.*

───────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:21-cr-00171-8—Eli J. Richardson, District Judge.

Argued: June 4, 2026

Decided and Filed: June 16, 2026

Before: SUTTON, Chief Judge; BOGGS and RITZ, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Richard W. Westling, PROSKAUER ROSE, L.L.P., Washington, D.C., for Appellant. Nicholas J. Goldin, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee. **ON BRIEF:** Richard W. Westling, PROSKAUER ROSE, L.L.P., Washington, D.C., Clay T. Lee, EPSTEIN BECKER & GREEN, P.C., Nashville, Tennessee, for Appellant. Nicholas J. Goldin, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

───────────────

## OPINION

───────────────

SUTTON, Chief Judge. Samuel Harris created a medical marketing firm to urge Medicare and Medicaid recipients to take cancer-screening tests. Once patients agreed to a swab, Harris would pay doctors to order the tests from a laboratory. The laboratory performed

the tests, paid Harris, and collected handsome income (as much as $10,000 per test) from federal healthcare programs. Harris made per-patient payments to doctors and his employees while receiving per-patient payments from the laboratory. Those payments implicated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, which generally prohibits paying or receiving remuneration in return for referring patients covered by federal healthcare programs. A jury convicted Harris of violating the Anti-Kickback Statute, and the district court imposed a below-Guidelines sentence of 30 months. We affirm.

I.

In early 2019, Samuel Harris took a job with DirectMed, a medical-marketing company. DirectMed canvassed residential neighborhoods, soliciting customers for swab tests that measure genetic predisposition to cancer before sending those tests to laboratories for processing. After seeking advice from a lawyer, DirectMed's founder became concerned that the firm "could not operate legally." R.657 at 43. He fired his sales force and shuttered his firm after just four months in business.

Undeterred, Harris and his brother set up their own company "to continue doing what DirectMed was doing." R.657 at 98. Harris's firm, Secure Health, sent salesmen door to door to seek patients for genetic cancer tests and paid telemedicine providers to sign orders requesting the tests. Secure Health paid its employees and the relevant telemedicine providers on a per-patient basis. It forwarded the tests and requisition orders to Crestar, a Tennessee laboratory. Crestar paid Secure Health for the referral on a per-patient basis, performed the test, and billed the payor, usually Medicare or Medicaid. Cancer screening tests generally make medical sense only for young patients with family histories of cancer, or where genetic predisposition to cancer can affect a doctor's choice of treatment options. Crestar and Secure Health, however, thought that federal health programs would pay without inquiring into the claims, and they identified telemedicine doctors that would sign the orders without inquiring into the patients' medical histories or needs. "The focus was money," not medicine. R.550 at 81.

Although the enterprise generated roughly $10,000 per test from federal-program reimbursement, it came with a serious legal risk. The Anti-Kickback Statute prohibits

"offer[ing]," "pay[ing]," "receiv[ing]," or "solicit[ing]" "remuneration (including any kickback, bribe, or rebate)" for "referring an individual to a person for the furnishing . . . of any item or service for which payment may be made . . . under a Federal health care program." 42 U.S.C. § 1320a-7b(b). The statute contains a few safe harbors. For example, it exempts certain discounts and payments to authorized purchasing agents. *See id.* § 1320a-7b(b)(3). Other than these pertinent carve-outs, a per-patient payment for referrals violates the statute regardless of whether it flows from laboratories to marketers, marketers to marketing employees, or marketers to doctors.

Harris and his brother sought legal advice about his business model. They met with several attorneys before retaining Christopher Esseltine as counsel. Harris's brother testified that "anything that we did in our business, we ran by" the attorney, including contracts with telemedicine providers, contracts with laboratories, and "HR issues within Secure Health." R.681 at 247. Esseltine claimed that he and Harris communicated almost every day. In May 2019, Esseltine produced a compliance memorandum that supported the legality of Secure Health's business plan. The memorandum noted three times, however, that the analysis operated on the understanding that Harris paid Secure Health's employees a flat salary. That was not true. Harris paid his employees on a per-patient basis.

A few months later, federal agents met with Harris, his brother, and their other business partners as part of an investigation into Secure Health. In 2022, a grand jury indicted Harris on one count of conspiring to violate the Anti-Kickback Statute, 18 U.S.C. § 371; 42 U.S.C. § 1320a-7b, two counts of receiving payment in return for referring patients covered by a federal healthcare program, 42 U.S.C. § 1320a-7b(b)(1)(A), and three counts of committing healthcare fraud and conspiring to commit healthcare fraud, 18 U.S.C. §§ 371, 1347, 1349. After a twenty-six-day trial, a jury convicted Harris on the three counts alleging violations of the Anti-Kickback Statute while acquitting him on the three healthcare fraud counts. The district court imposed a below-Guidelines sentence of 30 months.

II.

Harris opens with the claim that the district court erred by refusing to instruct the jury on his advice-of-counsel defense.  We review the denial of a proposed jury instruction for abuse of discretion.  *See United States v. Svoboda*, 633 F.3d 479, 483 (6th Cir. 2011).

An advice-of-counsel defense requires the defendant to establish that he "(1) fully disclosed all pertinent facts to his lawyers and (2) relied on the advice of counsel in good faith." *United States v. Householder*, 137 F.4th 454, 488 (6th Cir. 2025) (per curiam); *see Williamson v. United States*, 207 U.S. 425, 453 (1908).  A fact is pertinent if it bears on liability.  *See United States v. Lindo*, 18 F.3d 353, 356–57 (6th Cir. 1994).  Defendants do not have to fully establish a defense before obtaining a jury instruction on it.  *United States v. Duncan*, 850 F.2d 1104, 1117 (6th Cir. 1988); *United States v. Johnson*, 416 F.3d 464, 467 (6th Cir. 2005).  But the district court has a gatekeeping role to play in ensuring that "evidence support[s] the conclusion" that a given defense applies.  *Lindo*, 18 F.3d at 356.  Else, the instruction "cannot aid the jury, and may confuse and mislead them." *Indianapolis & St. Louis R.R. Co. v. Horst*, 93 U.S. (3 Otto) 291, 299 (1876).

The problem for Harris is that he failed to disclose all pertinent facts to his attorney. Harris in particular failed to disclose to his counsel (Esseltine) that he paid his employees on a per-patient basis rather than on a monthly-salary basis.  That fact bore on the legality of Harris's business.  By paying his employees patient by patient to refer people to Crestar for services, Harris "willfully offer[ed] or pa[id] any remuneration" "to refer an individual to a person for the furnishing" of services covered by Federal healthcare programs.  42 U.S.C. § 1320a–7b(b)(2). The first count of the indictment charged him with doing precisely that.  The reality that a firm pays kickbacks, moreover, lends credence to the concern that it also receives them in willful violation of the Anti-Kickback Statute—the conduct covered by the charges in the second and third counts of the indictment.  *Cf.*, *e.g.*, *United States v. Montgomery*, 2022 WL 2284387, at \*12 (6th Cir. June 23, 2022) (noting that a defendant "offer[ed] commissions to customers" and also "receive[d]" commissions); *United States v. Grow*, 977 F.3d 1310, 1320, 1328 (11th Cir. 2020) (per curiam) ("[A] reasonable jury could find that [the defendant] had an intent to defraud

because he paid, and had his representatives pay, kickbacks for the recruits to order the creams and vitamins.").

Making matters worse, Esseltine premised his advice on the erroneous belief that Harris paid his employees on a monthly-salary basis. Esseltine's memorandum to Harris treated the payment of employees as "[t]he first issue to consider" and called per-patient pay structures "an issue." R.666 at 257–58. Esseltine's advice, quite reasonably, emphasized how Harris paid his employees. It follows that Harris withheld a pertinent fact when he failed to disclose the truth about those payments. The district court did not abuse its discretion in declining to issue the advice-of-counsel instruction.

Seeing things differently, Harris claims that he presented evidence that he told his attorney about the kickback pay structure. He points to his brother, who testified that he and Harris "wanted to make sure everything in our business was set up correctly, so anything that we did in our business, we ran by" the attorney. R.681 at 247. But Harris's brother did not testify that he told counsel that the business paid its employees on a per-patient basis. Harris's lawyer (Esseltine), moreover, testified that Harris never told him about making per-patient payments and that his legal memorandum premised its analysis in three separate places on that assumption. The district court did not abuse its discretion in finding that Harris failed to disclose this pertinent fact.

In a variation on this theme, Harris contends that he began paying kickbacks after he sought the advice of counsel. Because the misconduct occurred later, Harris suggests that (at the time he requested the advice) he properly disclosed all the pertinent facts he knew. But while the advice-of-counsel defense does not require defendants to disclose facts they do not know, it does require them to follow counsel's advice. The memorandum in question relies, in three separate places, on the incorrect understanding that Harris would pay his employees a flat salary. It follows that any post-memorandum deviation to per-patient payments falls short of "good faith reliance on counsel's advice." *Lindo*, 18 F.3d at 356.

III.

Harris separately challenges the district court's denial of his motion for a mistrial after an improper remark by the prosecutor. As the Supreme Court has noted when considering the Double Jeopardy Clause, the "broad discretion reserved to the trial judge" when considering whether to declare a mistrial "has been consistently reiterated." *Illinois v. Somerville*, 410 U.S. 458, 462 (1973). We consider only whether the district court abused that discretion, *United States v. Wall*, 130 F.3d 739, 745 (6th Cir. 1997), and thus we reverse only where the prosecutor's conduct "affected the fairness of the trial," *United States v. Davis*, 514 F.3d 596, 614 (6th Cir. 2008) (quotation omitted).

It did not. Harris's brother testified that he and Harris spoke to several attorneys because they wanted to structure their business lawfully. On cross-examination, the prosecutor suggested that the jury should draw the opposite inference from the number of attorneys Harris chose to contact. "[D]espite all those calls," the prosecutor asked, "it wasn't until you got to Mr. Esseltine that you found somebody that worked; is that right?" R.681 at 284–85. After follow-up questions about a pair of other attorneys contacted by Harris and his brother, the prosecutor gestured to Harris's lawyers and asked, "Do you remember that [Harris] actually called Epstein Becker & Green in April of 2019, the very attorneys that are sitting here [?]." *Id.* at 286–87. As the defense objected, the prosecutor hastened to add, "not these same attorneys." *Id.* The district judge held a bench conference, after which he instructed the jury that the identity of Harris's counsel "is not relevant to any issue" and that they should "disregard the comment." *Id.* at 291. The defense team moved for a mistrial, arguing that the comment improperly implied that even Harris's current defense attorneys had considered his business unlawful. The district court stated that the comment "shouldn't have been made for multiple reasons." *Id.* at 302. But after briefing by the parties, it denied the motion for a mistrial, noting among other things that the meaning of the comment was not obvious and that it did not necessarily imply anything about Harris's current counsel. He added that Harris could just as easily have declined to hire Epstein Becker because he did not have the money to retain the firm before Secure Health began its operations, lawful or otherwise.

We assess claims of prosecutorial misconduct in two steps. *Cristini v. McKee*, 526 F.3d 888, 899 (6th Cir. 2008). We start by asking whether the prosecutor made an improper remark or otherwise behaved improperly. *United States v. Carroll*, 26 F.3d 1380, 1387 (6th Cir. 1994). If so, we ask whether the remark was prejudicial, gauged by these considerations, among others: "whether the conduct and remarks of the prosecutor tended to mislead the jury," "whether the conduct or remarks were isolated or extensive," "whether the remarks were deliberately or accidentally made," "whether the evidence against the defendant was strong." *United States v. Warshak*, 631 F.3d 266, 302 (6th Cir. 2010) (quotation omitted); *see United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001); *United States v. Betro*, 115 F.4th 429, 446 (6th Cir. 2024) (quotation omitted).

In this instance, the government does not dispute that the prosecutor made an improper remark. Even so, the court did not abuse its discretion in holding that the remark did not prejudice Harris under the four relevant considerations.

*Little potential to mislead.* Prompt action by the parties and the district court prevented the remark from misleading the jury. Because "juries are presumed to follow their instructions," *Zafiro v. United States*, 506 U.S. 534, 540 (1993) (quotation omitted), timely and specific limiting instructions by the district court reduce the risk of harm to a defendant, *see, e.g.*, *United States v. Eaton*, 784 F.3d 298, 310 (6th Cir. 2015); *United States v. Wells*, 623 F.3d 332, 346 (6th Cir. 2010). The reality that a witness never answered the improper question, we have said, has a similar effect. *United States v. Buckley*, 934 F.2d 84, 89 (6th Cir. 1991). Because Harris's objection prevented an answer to the question and because the district court told the jury to disregard the comment, the remark had little potential to mislead.

*Isolated comment.* The district court correctly deemed the comment isolated. Harris objects to only one question, not a line of questioning or a pattern of remarks. *United States v. Wandahsega*, 924 F.3d 868, 884 (6th Cir. 2019). The length of the proceeding also cuts against Harris. *See Betro*, 115 F.4th at 449. The prosecutor's comment occurred twenty-one days into a twenty-six-day trial involving over sixty witnesses. After the warning, the prosecutor never revisited the topic. The comment represents a single regrettable moment in a lengthy trial.

*Limited improper intent.*  The brevity and limited significance of the comment make it look more like a spur-of-the-moment mistake than a Machiavellian maneuver.  The prosecutor's explanation to the judge focused on the size of Epstein Becker & Green and its large healthcare practice rather than on its association with the defendant.  The isolated nature of the comment and the district court's subsequent remarks approving of the prosecutor's professionalism, all told, suggest limited improper intent.  *United States v. Mejia-Ruiz*, 433 F. App'x 455, 461 (6th Cir. 2011); *Slagle v. Bagley*, 457 F.3d 501, 527 (6th Cir. 2006).

*Strength of evidence against the defendant.*  The government introduced substantial testimony indicating that Harris paid and received kickbacks and that he knew doing so violated the law.  It offered (1) evidence that the relationship between Crestar and Harris's firm violated the Anti-Kickback Statute and (2) text messages that permitted the inference that Harris understood that per-patient payments violated the law.  On this record, it is difficult to draw the conclusion that this stray comment affected the verdict.

All in all, the district court did not abuse its discretion in finding that the remark did not prejudice the defendant and did not require a new trial.  *United States v. Galloway*, 316 F.3d 624, 632 (6th Cir. 2003).

IV.

Harris also challenges one of the district court's evidentiary decisions, and we also review that decision for abuse of discretion.  *United States v. Carpenter*, 157 F.4th 841, 849 (6th Cir. 2025).

Harris opened his case by attempting to introduce a recorded meeting between himself, his business partners, and a pair of federal law-enforcement officers.  The government objected, claiming that the recording contained inadmissible hearsay.  The district court refused to admit the recording in its entirety, noting that a proper hearsay analysis would have to proceed line by line.  Harris objected to the court's decision not to admit all of the tape.  But he agreed to offer shorter clips as a "half measure for now."  R.681 at 31.

No abuse of discretion occurred in permitting this half-measure. The district court correctly noted that any hearsay analysis would have to proceed line by line. Federal Rule of Evidence 801(c) defines "hearsay" as a "statement" made out of court and offered for the truth of the matter asserted. The word "statement," within the meaning of the Federal Rules of Evidence, refers in turn to "a single declaration or remark" rather than a larger narrative. *Williamson v. United States*, 512 U.S. 594, 599 (1994) (quotation omitted).

Once the government offered a hearsay objection, the district court stood ready for remark-by-remark analysis of the recording. *See United States v. Canan*, 48 F.3d 954, 960 (6th Cir. 1995). Likely recognizing that this analysis would take a lot of time, Harris offered clips from the interview but never the entire tape. Under the federal rules, "[a] party may claim error in a ruling to admit or exclude evidence." Fed. R. Evid. 103(a). But just as parties can forfeit evidentiary objections, *see United States v. Mezzanatto*, 513 U.S. 196, 201–03 (1995), so too can they simply decline to offer evidence for a ruling by the district court. That happened here when Harris agreed to the half measure and never renewed a request to admit the full tape.

Harris responds that the district court erred by failing to admit every single statement in the tape at the outset. It did not. Even if we forgive Harris for failing to renew this argument later in the case, the court correctly appreciated that the full tape contained inadmissible hearsay. The tape recorded, for instance, one of Harris's business partners claiming, "That's ultimately why we chose him because we felt confident that he knew what he was doing." R.681 at 146. The district court acted well within its discretion when it deemed that statement "rank hearsay" and excluded it. R.681 at 146. The Federal Rules of Evidence except "statement[s] of the declarant's *then-existing* state of mind" from the hearsay rule. Fed. R. Evid. 803(3) (emphasis added). But the business partner's statement about his state of mind months or years earlier does not fall within that exception. *See United States v. LeMaster*, 54 F.3d 1224, 1231 (6th Cir. 1995). Harris has no answer to this point.

We affirm.